May it please the Court, I'm Joseph Daly on behalf of the Appellant Pension Funds. I'm going to attempt to reserve three minutes for rebuttal. Your Honors, while this appeal presents numerous issues for the Court's de novo review, I'd like to focus on two of the more prominent ones. First, the defendant's false and misleading statements of existing material fact concerning pipeline status and the new system greenfield sales. And second, defendant's July 2012 reaffirmed forecast of 20-25% earnings growth for the fiscal year already in progress, despite the fact that there was an already completed first quarter with an undisclosed 19% earnings decline. Now, the misrepresentations of existing fact concern two subjects very important to both analysts and investors, and that is the status of QSI's lucrative greenfield sales as well as its existing pipeline of deals. Throughout the class period, company speakers, including both the defendants and executives whose statements could be imputed to the company, claimed that both were doing just fine. In June 2012, and I'm not going to paraphrase here, I'll let you know when I'm quoting an exact statement, Chief Financial Officer Holt claimed, quote, it's greenfield for the most part, end quote. On October 27, 2011, the Chief Executive Officer Plochacki announces that he needs to, quote, set the record straight, and he says that, quote, greenfield opportunities are plentiful. On November 2011, Plochacki again denies that QSI's business is slowing down. He calls the saturation worries that analysts had brought to his attention as baseless and says, quote, there is nothing drying up and there is nothing slowing down, end quote. Just a few more. In December 2011, Plochacki says the current pipeline, quote, is very robust, end quote. Coming into the new year, January 2012, Plochacki says, quote, the pipeline continues to build to record levels, end quote. He also says that there is, quote, nothing out of character in the pipeline today, end quote. So I think I'm trying to get your point here, which is to say those are not merely projections. Those are statement of current fact. And I would not even say they are merely projections. Those are statements of existing fact. Well, that's what I just said. Okay. And what I also mean to say is those are not even underlying assumptions. Those are statements of existing measurable fact that we know, based upon just a myriad of cross-corroborating accounts from witnesses inside the company, including both former directors and former executives, that those statements were false. So how do we know that from the pleadings or the information we have in front of us, that Plochacki knew that he was lying? Or rather, that he knew that this was not true? For those present, two points in response, Judge Fletcher. Number one, he doesn't have to absolutely know. Because these are statements of present existing fact, all we need under this Court's precedence is deliberate recklessness. He could have made those statements with deliberate recklessness as opposed to actual knowledge, which would apply to pure forecasts. Number two, we know that he knows that those statements were fact. By early 2010, the company's former chief of operations says it was obvious within the company that the slowing growth was happening, that QSI was moving toward a recurring revenue model, and that the big sales were drying up. Plochacki admitted in March 2011, in a conference call with one of our confidential witnesses, a chief information officer, that QSI sales had become largely replacement sales by that time, and that market saturation was forcing lower-cost deals. We know that, and that is diametrically opposed. That is 180 degrees away from what Plochacki was telling the analysts in response to very pointed, direct questions from those analysts. Those are the two things that matter to analysts and matter to the market. The analyst had said, and I'm going to jump ahead here to context. You mentioned earlier to the government lawyer that context was important. Context is of paramount importance here. This court has said as far back in 1989 in the Casella case that context matters. In that case, the comment that was found to be actionable was that something was a sure thing. It sounds fairly innocuous in isolation, but in the context of what was going on there, somebody reassuring somebody to invest in something, the fact that it was a sure thing mattered. Here, what we have is the defendants responding to direct analyst questions from skeptical analysts who have looked at the market. They have seen that the market for these EHR, electronic health records, appears to have been saturated. The plateau has been reached, and it has flattened out. And these defendants have specifically responded to them and said, no, that's not true. And the analysts have said, quote, the defendant's pipeline commentary is, quote, critical to KUSI's stock performance. And that's excerpt of Record 67. Here's a question for you. So far you've been quoting statements from Plachocki, if that's how you pronounce the name. You've got several individual defendants. Have the other individual defendants made statements of current fact that turn out not to have been true? Yes. And I'm sorry, the very first one I mentioned from June 2011, that was the chief financial officer, Holt. He is a defendant here. And remind me, what did Holt say? Holt said, quote, it's Greenfield for the most part, end quote. In other words, reassuring the analysts, we're not talking about these recurring revenues from the highly competitive practice management part of the industry. We are looking at Greenfield. Greenfield is a term of art for that industry. That statement was made pretty early on and for the most part is kind of vague. I think that's much less, if the right word is reassuring, or much less sort of precise than the statements later made by Plachocki. Is that all you've got for the other defendants? Exactly. No, that's a question. Is that all you have for the other defendants? No, because obviously one of our defendants is QSI itself. No, I mean individual defendants. I'm sorry. Yes, yes. That's all you have for the other individual defendants. That's all I have, but I would like to mention the president of NextGen in May 2012. Right near the end of our class period, he actually walks back something. Plachocki carelessly admits to the analysts a few days prior to that that the sales seem to have elongated. The stock takes a huge hit, 17% hit on that day. No, no, no. He's finally fessing up is what's happening. He is, yes, and that's exactly what my brief said. And Decker walks that back and he says, no, if anything, the sales cycle, quote, is compressing. I went through the data, and we know that's false because they had just missed the prior quarter and they were in the middle of missing that particular quarter by 19%. And so it was a huge miss, and it was happening at the time. And the thing is these are not circumstances popping out of the blue. Like I said, we were told back in early 2010 by a chief of operations who had left the company. He is in the executive suite, and he has told us, and it's in our complaint, and it's alleged that by early 2010 the slowing growth was apparent inside QSI. QSI was moving to a recurring revenue model and that the big sales were drying up. He even warned Defendant Razin about that. How much does it matter as a practical matter that you retain all of the individual defendants? Well, more is always better. I get that. I imagine this case could go forward very easily with just Mr. Pachocki and the company itself, but I don't want to ---- No, no, I'm interested in the practical questions. For example, do we have DNO insurance that would be expanded if you got more individual defendants? I mean, is there some particular reason why you need more than Pachocki in here as an individual defendant? I'm afraid I don't know the answer. You don't know? Okay. Could I ask you about the judicial notice issue? Sure, please. So did you object to what the court did on judicial notice? We made a very strong speaking objection at the motion to dismiss hearing. Were you objecting to the taking of judicial notice, or did you recognize that some documents had been referred to in the complaint and that at least the existence of the documents was proper? The latter. The plaintiff's counsel argued that they understood quite fully that judicial notice could be taken of the documents for their existence. He did make the very strong point that we are not accepting judicial notice of the documents for either the truth of the matter asserted within or certainly to bolster or shore up the defendant's speaking representation that those cautions had been widely disseminated to investors. We refuse to concede that point. I would like to add those documents came in with defendant's reply brief. So they came in. They were argued about at the hearing. The district court judge did ask defense counsel, well, now, of course, those warnings were put up on the screen for the investors to read during the things, and he sort of gave a half-hearted, tepid response. And as we know now because of what they've submitted in their supplemental excerpts of record with transcripts, it is quite obvious each one of those 378 identical verbatim warnings that appeared over the course of 11 months were flashed up on the screen for the duration of one sentence. No time at all for investors to sit there and read these supposedly meaningful cautions that, in truth, were just mere boilerplate. And this court has not yet addressed whether or not something that is boilerplate can fall within the meaningful cautions prong of the PSLRA Safe Harbor. We were beat up a little bit for citing out-of-circuit cases, but that's because this court hasn't addressed it yet. But as I said in my brief, I'm positive this court will not agree that boilerplate repetitive caution that doesn't even mention what's happening at that moment within the corporation is meaningful. So if we would agree with you that the district court went too far in the way it took judicial notice, what does that get you? Well, for one thing, that gets us the forecast. Remember, the district court took those warnings and used them to absolve the defendants of every forward-looking statement they had made. Well, no, that's wrong. The district court very clearly says in the denial of your motion for reconsideration and then to amend that he considers them only for the purposes of whether they were put up during that time. I realize he said that. The minister says. That is true, Your Honor. I agree that he said that he said that, that's why he did it. But I think it's apparent, and I argued in my brief, it's apparent that he used them for much more. He did go into them. You know, it's one thing to say that the defendants are not telling the truth. It's another thing to say the district judge is not telling the truth. I apologize. If that's how it came across, I apologize. That occurred at the motion to reconsider, correct? Yes, I believe so. And as I said, those cautions were supposedly insulating their forward-looking statements throughout the entire class period. I, this morning, am focusing on just the June and particularly the July 2012 earnings forecast, the repeated forecasts of 20%, 25% earnings growth. Those statements made in several proxy statements over the course of three proxy statements that month, those statements were being given to, again, investors and analysts hungry for information, while at the same time, QSI had, number one, just finished its fiscal year 2012 disastrously, missed the numbers by double digits. Analysts were shocked. The stock gets punished. QSI reassures the analysts, no, no, no. Some of the deals we missed in that last quarter of that last fiscal year, they're moving into this new quarter. Everything's going to be fine. Analysts bit. They wrote glowing articles talking about how it was just a stubbed toe. It was just a blip on the radar. They urged investors like our clients to buy again, which they did. Fast forward now to the first quarter of fiscal year 2013. Again, those 20% to 25% forecasts are coming out. They've just missed the first quarter's earnings guidance by 19%. They have missed the 20% to 25% 19% on the other side, a 45% miss. They know they have missed it. That happened three weeks ago when they're still making these forecasts to the market. And by any stretch of the imagination, those cautions at that late point could not have been meaningful. I see that I'm running down into about two minutes. I'd like to reserve. Thank you. Thank you, Kenneth. Good morning, Your Honors. May it please the Court. Peter Wald, Latham & Watkins for the appellees. Judge Pallias, if I may, start with the question that you ended with, which is the investor conference statements, as Judge Nelson pointed out. I'm sorry, Judge Fletcher pointed out. Those investor slides only go to the forward-looking statements that were made at the investor conferences. The appellants did not object to the Court taking judicial notice. It's in their brief. As you pointed out, the Court asked whether they objected. They said, no, we don't object. We don't object for them to be noticed for the purpose of saying that they were shown at the same time as the forward-looking statements that are alleged to be misleading. Under the statute, that's all that's required. And, in addition, there are – Does meaningful imply an obligation to let, you know, prospective investors review the statements? I think, Your Honor, first of all, there are a series of quotes in our brief and in the exhibit showing that they were given an opportunity to review them. Well, no, it's just a transcript, and it says I'll pause for a moment so you can read it, and there's nothing in there that indicates how long between that sentence and the next. Well, that's fair, Your Honor, but I also think that in this circuit when people are directed to safe harbor warnings and those warnings are available in slides, that is the obligation. Otherwise, this Court is going to be in the business of saying a minute's not enough, two minutes is enough. Well, but if the question is judicial notice, and you're asking us to take as a matter of judicial notice that there was ample time, I don't think they conceded that there was ample time, no matter how you read, how broadly you read their concession. Well, Your Honor, the language of the statute, if I may quote it, says under 15 U.S.C. 78U-5E provides, quote, the Court shall consider any cautionary statement accompanying the FLS, which are not subject to material dispute. No, I understand that. No, I don't. You're not taking the point that I think Judge Pius was making, which is to say if you flash it up on the screen for five seconds and it's got an awful lot of words that would take any normal person 30 seconds to read, that doesn't strike me as really giving them a fair opportunity to read and understand it. Well, Your Honor, I don't believe that they've even raised that issue in their brief if they concede that these were shown and that they don't object to taking judicial notice, but what they do object is to the content of it. So and depending on how the ---- But what I'm raising is you suggested to me that it's established that they had ample time to read. I don't think that's established. That may be, Your Honor. But what I would say is that under the statute I don't believe that that's a relevant consideration. But even if it is a relevant consideration, they have conceded in their briefs and at oral argument that they did not object to the taking of judicial notice. If I can ---- No, go ahead. No, no, go ahead. No, I was going to change the subject. That's fine. I'm actually quite concerned with these various statements of current fact by Mr. Plachocki about the pipeline being full, being robust, and so on. Those are not forward-looking statements. Those are statements as to current fact, and they strike me as wrong. How do you deal with that? Let me start with your last observation, Judge Fletcher. They're not wrong on the record. Okay? What do you mean by saying on the record? This company enjoyed unquestioned revenue and EPS growth and pipeline growth through 3-31-2012. There's never been a restatement. There are vague allegations that the appellants make that people at various points in time before the class period and after the class period said that there were problems. But the undisputed financial statement record of this public company, audited public company, starting with the class period May of 2011, which is the end of the fiscal year 2011, then the first quarter of fiscal 2-12, which is June 30, 2011, the second quarter of fiscal 2-12, which is 9-30-2011, the third quarter of fiscal 2012, which is 12-31-11. And this is in our briefs, Your Honor. It was before the district court, and the district court so found. Every single one of those shows a record increase in revenues, a record increase in earnings, and a record increase in pipeline. That last one, I don't think I agree with you. Well, Your Honor, pipeline was reported, and the numbers go from, I think it's 163, and finally they get to 189. They get to 189, Your Honor, as late as 6, as late as 3-31, I believe. I'm sorry that I don't have them, but here it is. The first time there's a decrease in the pipeline, Judge Fletcher, is on July 26, 2012. That is the first announcement of a decrease in the pipeline. It goes down to 153. That's the first announcement. Fair enough. The announcement before that is May 17, 2012, where the pipeline is announced to be 189 million. Well, I understand that. That's the announcement. That's what Palachocki says. What is the evidence that that's not the pipeline? The pipeline is the company's estimation of deals that will close in the next six to eight months. It's reported. The methodology for it is reported. It's never disputed by the plaintiffs. They don't say that they didn't follow the methodology. They don't say that there was a misstatement of what that was. And they don't ever in their complaint allege that these publicly reported pipeline numbers are wrong. The most that they say is that they have vague statements from confidential witnesses saying there's a slowing down in the business. Now, if I could take that on for one second, Your Honor, what sense does that make, starting with this class period? The plaintiffs themselves allege that the era, the statute by Congress pumping $60 billion into this industry, began to show an uptick in sales and to drive the sales of this company and of this industry starting in 2011. And what happened in this case is that the numbers that are reported and not questioned are driven by those era incentives. Go with me, if you will. I understand you're going to contest this, but for purposes of the question, assume that it is correct. Assume that, for example, the May 17th conference call statement by Plochacki about the robust pipeline and so on, assume that that is not borne out by the facts that are appropriately alleged and supported in the complaint. So assume it's wrong, right? I understand you're not going to concede that. Understood. That strikes me as a statement of actual and current fact rather than a forward-looking statement. Are you with me so far? Yes, I would like to speak to that, but, yes, I'll assume that also. There are aspects of it that I think are forward-looking, but go ahead. Well, no, he's saying the pipeline is full, the pipeline is robust, and so on. Now, you're saying that that's a true statement. I'm asking you to assume that by May 17th, 2012, that that's a false statement. What do we do with that? That strikes me as you're in trouble if that's, if my representation is true. The statement, Your Honor, is that it keeps growing. And as of 331, which is the time period that the statement. I can read from the statement if you want. Okay. But the statement is, under my hypothetical, the statement is false. And I'm asking you what do you do if that is, if it's true that the statement is false? All right. Then I think the next prong of the analysis, assuming the statement is current, not forward-looking, and false, is that one then goes to Sianer. And the question of whether or not allegations of Sianer are adequate, because, as you know, they're not really challenging the forward-looking statements. So if what we're left with is the current statements, then the question there is were they true at the time they were stated? And what's the degree of Sianer that we need for Plochecki? He says reckless disregard is what we need to show. It's the heightened standard, Your Honor, of deliberate recklessness in this circuit. That's correct. So how do you get around him saying, as a matter of fact, that he himself knows that we've not gotten ourselves to, that this is a sufficient showing of likelihood that he knows or is recklessly disregarding the truth of this. I mean, he's basically representing as fact that this is what is true. And I'm asking you to assume that it's not true. How do I get around finding that there's sufficient Sianter when he himself is saying, I mean, he's in a position to know, he says I know, and he says something that's false? Your Honor, it seems to me, and I may be misunderstanding the hypothetical, but it seems to me that you're asking me to assume that he's knowingly making a false statement. Well, he is saying that he knows this, and it is false. Now, he may be lying about whether he knows it. I think that's what your defense has to be at this point, that he's saying I know this, but, in fact, he doesn't know this. Your Honor, all I can say is that the reported numbers back Mr. Plahotsky up. No, you're now fighting the hypothetical. Fair enough. And I understand you're not conceding my underlying hypothesis here. Right. I think that Mr. Plahotsky, in May of 2012, has had a toe stub for the first time in five quarters. And to be clear about what the toe stub is, revenues go up. Earnings for the year go up. The toe stub is with respect to the quarter. It's with respect to certain sales that did not materialize at the end of the fourth quarter. That's all that happened here, and they got pushed into the next quarter. And he is in the middle of error, and he's thinking to himself, what happened? Well, what happened, Your Honor, is that on March 7th, 2012, the government announced a delay in the requirement that people qualify for a Stage 2 certification by one year. March 7th is within the fourth quarter of fiscal year 2012. And as Mr. Plahotsky explains to the market in July, when they finally come to grips with what's happened, when he can see what's happened and there actually is a reduction in the pipeline, he goes to the market and he says, now we understand what happened. This announcement in March of 2012 caused people to delay their buying of our products because they weren't required anymore by the government to meet this deadline of meaningful use. And that's when they declined to reaffirm guidance. And that's just not fraud, Your Honor, in our submission. I mean, he is dealing in real time with what he's seeing. There's no indication that the numbers that he's seeing are other than what they are reporting. The most, they don't have an accountant coming in here and saying, I was in charge of keeping the pipeline numbers. I told Plahotsky that instead of it being 189 million, which would have been a record, it was actually 164. But he went ahead and he reported 189. They don't have anything like that, Your Honor. What they have is reported figures that they don't challenge, and they have CWs who make allegations about a slowing down before ERA, before the class starts, or after July. And that's the sum and substance of their criticism of these audited public numbers. So respectfully, Your Honor, I appreciate that you asked me to accept the hypothetical, but the sequence of events historically is not challenged and cannot be challenged. These are reported audited numbers. They've never been restated. They have never been seriously questioned by the plaintiffs. They have vague CW allegations that do not point to contrary reports. This Court's jurisprudence has been clear since Silicon Graphics going back to 1999, Lipton in 2002, QTERA, Intuitive Surgical. All of them say the same thing. If you're going to say that figures are wrong, you need to show contradictory evidence. You need to not just say, oh, there were bad sales reports. You need to say what was in those sales reports that were contradictory. And there was none of that here, Your Honor. So it's difficult for me to deal with that hypothetical in light of that. Their entire case comes down to their CW allegations, and if you go through the CW allegations one by one, as we have done in our brief, Your Honor, they do not amount to anything that is cognizable. CW, as the Court knows, Zucco sets out the standard for analyzing CW allegations, and the courts are skeptical about CW allegations because talk is cheap and it's easy to say anything you want. So Zucco says what you have to show, and you have to show the particulars of the alleged transgressions with specific dates, documents, or content of the documents. And the employees need to be able to say that they were there when those specific adverse contents got communicated to the defendants. None of that is present here, Your Honor, none of it. The most that they have is a statement about Mr. Plahotsky in March of 2011, before the class period, before the era incentives kick in, before five quarters of unquestioned record revenues and earnings results kick in. That's the most that they have tying any of these allegations to individual defendants. And so on the record, once you take a look at the CWs, we submit, Your Honor, that on the record what they're left with is a claim that these pipeline numbers are wrong. But no evidence, nothing that would satisfy the PSLRA's clear directive. And most recently in intuitive surgical, this Court could not have been clearer. Negative characterizations of reports without reference to specific sales data is not enough. That's what the PSLRA got rid of. That's what we're not going to permit as a matter of pleading.  Thank you, Your Honor. Thank you. Thank you, Your Honors. Okay, well, I've teased it up. What do you have specifically that tells us that what Plahotsky said was not true? That is my first point, actually, Judge Fletcher. We have a 14-year director of the company, Ahmed Hussain, who told us, which is in his debacle, the reaffirmed earnings forecast as late as July 23, 2012, the withdrawal of guidance three days later that completely flabbergasted the market. Hussain went to Plahotsky and said, and now I am paraphrasing, I don't have an exact quote, what gives? And Plahotsky told him that Defendant Razin, the founder of the company, ordered them to  Council said that the sales from the last quarter of that disastrous fiscal year get pushed into the next quarter. I misspoke earlier when I made an implication about the district judge, but I can say this. That is a false statement. That is not what happened. Analysts were outraged that this tale of large deals getting pushed into the next quarter was put out there, because that's not what happened. If that had happened— We have both what Telabs and what this circuit says we should— No, I don't want the other cases. I want what do you have in this case? And I'm sorry, I was just going to talk about the paradigm of looking at Sientra holistically. And, I mean, we have the temporal proximity. We have a three-day difference between the last false statement and the 180-degree turnaround. We have Mr. Plahotsky's sales of 87 percent of his holdings on a single day in February 2012 when he hadn't sold a share for four years. He sold just after telling investors now is a great time to buy QSI stock. He sold just after the market has started—is hovering around $45 per share. He managed with that one-day sale— I know what you allege. All right. And we also have the core inference. Let's be honest here. The division that this is all happening in is the next-gen division, one of four divisions within QSI. That division alone accounted for 75 percent. I know that, too. All right. Is there anything new? You would ask the district court on the motion for reconsideration for a leave to amend. Is there anything new you would add? Judge Paez, I was going to mention that as well. I'm afraid I'm nine seconds or ten seconds in. But we offer to amend with more specifics of the numbers that counsel was saying that we have not bothered to plead. And he's talking about quarter after quarter of unquestioned growth. If given leave to amend, we can show that actually revenues were actually withdrawing sequentially. We mentioned that in our motion for reconsideration papers, and we feel we would be able to amend with that, along with a host of other things. Your Honors, I would just like to close by saying, looking at our pleaded facts, accepting them as true, and considering them holistically, we are confident that both falsity and scienter have been adequately alleged. You say along with a host of other things. What's the most significant points you would add in an amended complaint? Flip one page back. We would be able to allege forensic analysis of QSI's financials. We would allege also with more post-class period analysts' discussions. I mean, remember, these are the people that are paid to dig into the financials and sort out what went on. And we would be able to allege again that it was not AARA, the American Reinvestment and Recovery Act, that affected this company so grievously. It was the fact that the very things that they had been warned about back in 2010, that is slowing Greenfield and a pipeline that was shrinking, that was the ultimate cause of KUSI's implosion. Thank you, Your Honors. Thank you, counsel. The case is there. You will be submitted.
judges: Reinhardt, W. Fletcher, Paez